## JAMES SLISKI'S CASE.

Suffolk. October 7, 1996. - January 15, 1997.

Present: WILKINS, C.J., ABRAMS, O'CONNOR, & FRIED, JJ.

*Statute,* Retroactive application. *Workers' Compensation Act,* Amount of compensation, Insurer, Decision of Industrial Accident Reviewing Board. *Insurance,* Workers' compensation insurance.

The provisions of G. L. c. 152, § 51, as amended by St. 1991, c. 398, § 78, providing special workers' compensation benefits in the form of increasing lost wage projections and that are deemed procedural in character pursuant to St. 1991, c. 398, were, by operation of G. L. c. 152, § 2A, fully retroactively applicable to "personal injuries irrespective of the date of their occurrence," and thus were applicable to a case pending before the reviewing board of the Department of Industrial Accidents at the time the amendment became effective. [129-130]

In a workers' compensation case, the reviewing board of the Department of Industrial Accidents correctly declined to apportion compensation benefit payments for a second injury between the successive insurers, and correctly ordered benefits to be paid by the second insurer determined on the basis of the injured employee's position and abilities at the time of his first injury. [130-134]

Where one member of a three-member panel of a reviewing board of the Department of Industrial Accidents resigned before a decision was signed and filed by the two remaining members, the decision was not thereby rendered invalid. [135]

APPEAL from a decision of the Industrial Accident Reviewing Board.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*James H. Tourtelotte* for CNA Insurance Company.

*E. L. Seeley, Jr.,* for the employee.

*J. Norman O'Connor* for American Policyholders Insurance Company.

FRIED, J. The insurer, CNA Insurance Company (CNA), appeals from a decision of the reviewing board (board) of the Department of Industrial Accidents (department) which held

CNA responsible for paying temporary total disability benefits to an injured employee under G. L. c. 152, § 34, as appearing in St. 1985, c. 572, § 42 (see note 5, *infra*), and § 51 (1994 ed.). We transferred the case to this court on our own motion. We affirm the board's holding that CNA is solely responsible for paying these disability benefits.

I

At the time of his injuries, James Sliski was enrolled in a cooperative education program through Chicopee Comprehensive High School. Pursuing a career as a carpenter, Sliski worked as an apprentice carpenter or cabinetmaker for Doane & Williams during the spring and summer of 1987. In October, 1987, Sliski entered into a cooperative education agreement with Hamilton Studios, insured by American Policyholders (American), to acquire skills in fine craftsmanship and woodworking. While at Hamilton Studios, on November 19, 1987, Sliski was involved in an accident in which his left hand was pulled into the blade of a saw. Receiving medical treatment, Sliski's index finger was amputated and his thumb was fused, resulting in a 60% loss of function to Sliski's left thumb and a 40% loss of function to Sliski's minor hand. American commenced paying weekly temporary total incapacity benefits under G. L. c. 152, § 34, at the rate of $96.39, based on an average weekly wage of $144.58.

In May, 1988, Sliski entered a new agreement with Doane & Williams, insured by CNA, under which he was to be employed as a painter's assistant. On June 9, 1988, Sliski fell through an elevator shaft at work and suffered spinal injuries that left him a paraplegic. He was eighteen years old at the time CNA began paying Sliski weekly temporary total incapacity benefits of $255.67 on an average weekly wage of $314.40.

Claims were filed and consolidated against both insurers to establish an average weekly wage under G. L. c. 152, § 51, which protects young employees who are injured early in their careers by including expected wage increases in the determination of such average weekly wage, the unit used to compute benefits under other sections of G. L. c. 152. On February 28, 1990, an administrative judge of the department ordered the first insurer, American, to pay Sliski temporary total incapacity benefits pursuant to § 34 in the amount of

$255.67, based on an average weekly wage of $383.50, from the date of the first injury to the date of the second injury.[1] He then ordered CNA to pay Sliski § 34 benefits of the same amount from the date of the second accident to December 20, 1992, after which time, CNA was instructed to pay Sliski $300.12 a week based on a projected average weekly wage of $450.18.

Before the board issued its decision, § 51 was amended by the Legislature. St. 1991, c. 398, § 78. The amended, and current, § 51 reads as follows, with the amendment's additions indicated by italics:

> "Whenever an employee is injured under circumstances entitling him to compensation, if it be established that the injured employee was of such age and experience when injured that, under natural conditions, *in the open labor market,* his wage [ ] would be expected to increase, that fact may be considered in determining his weekly wage[ ]. *A determination of an employee's benefits under this section shall not be limited to the circumstances of the employee's particular employer or industry at the time of injury.*"

Addressing the implications of these additions, the board noted that "the administrative judge did not strictly adhere to the language of former § 51 in making wage projections." The former § 51 had been strictly interpreted to limit such projections of wage increases to "that which might have been expected from the particular employer" or industry. *Gagnon's Case,* 228 Mass. 334, 338 (1917). See *Bursey's Case,* 325 Mass. 702, 706 (1950). Departing from the restrictive standard set forth in *Gagnon* and *Bursey,* the administrative judge had "based calculation of the employee's average weekly wage at Hamilton Studios on the employee's 'own wages at a similar (not identical) employment in the same general industry. . . .' The judge's application of the statute, in fact, followed more closely the language and legislative intent of current § 51."

---

[1]The board reversed this part of the administrative judge's decision, holding that the application of § 51 to Hamilton Studios was inappropriate because Sliski was a full-time high school student at the time of his first injury and there was no reason to believe that his wages would have increased significantly during the school year, the term of his employment.

The board rejected CNA's argument that the amended § 51 should not apply retroactively to this case. The board explained this decision by pointing out that the amendment had been designated procedural by the Legislature and it was entitled to "full retroactive effect" because it did "not apply to any particular stage in the proceedings." CNA argued that responsibility for paying Sliski's benefits should be apportioned between both insurers because Sliski's career in carpentry had ended at Hamilton Studios and CNA's liability for § 34 benefits should therefore be limited to the "average weekly wage [Sliski] was capable of earning as a partially incapacitated painter's assistant." The board rejected this argument. The board declined the invitation to explore the interrelationship between the wage increases provided under § 51 and the cost of living adjustment (COLA) benefits provided for under § 34B, finding it to be "premature" because Sliski would "not be eligible for COLA benefits under § 34B unless and until he establishes entitlement to permanent and total incapacity benefits under § 34A."

On appeal, CNA reasserts its claim that § 51, as amended, should not apply retroactively in the instant case and its claim that Sliski's benefits should be apportioned between American and CNA. Additionally, CNA requests us to resolve the relationship between § 51 and § 34B, arguing that these benefits "are mutually exclusive" in the present case. Finally, CNA disputes the validity of the board's decision on the ground that it was denied its entitlement to review by a panel of three when one of the members of the board which heard the case retired before the decision was filed and the decision was signed by the remaining two members.

II

A

We agree with the board's holding that the amended § 51 applies retroactively to Sliski's case. Ordinarily, a statute is applied prospectively unless it provides otherwise. Procedural statutes, however, are applied retroactively. *Commonwealth* v. *Fourteen Thousand Two Hundred Dollars*, 421 Mass. 1, 5 (1995), quoting *Hein-Werner Corp.* v. *Jackson Indus.*, 364 Mass. 523, 525 (1974). When the Legislature amended the Commonwealth's workers' compensation laws in 1991, the

amended § 51 was included in a group of amendments which were "deemed to be procedural in character." St. 1991, c. 398, § 107. By virtue of G. L. c. 152, § 2A, those amendments "deemed to be procedural or remedial only . . . shall have application to personal injuries irrespective of the date of their occurrence, unless otherwise expressly provided."

While it is true that interests of efficiency and finality will not grant procedural statutes retroactive effect if the proceedings of the case have already progressed past the point at which the statutory change was applicable, see *City Council of Waltham* v. *Vinciullo*, 364 Mass. 624 (1974), these limitations do not operate here. As the board noted, where "the statutory change does not apply to any particular stage of the proceedings, the change is to be given full retroactive effect, unless fairness dictates [otherwise]." The "open labor market" addition to § 51 sets forth a new standard by which a "claimant's compensation rate based on his lost opportunity to receive increased wages" is to be determined. The board's decision anticipated that periodic reexaminations would be necessary to reassess Sliski's wage projections over time, especially since the determination involves quantifying the anticipated wages a teenager would have expected to earn over the rest of his life, had he not been injured. With such reexaminations a virtual certainty, the board correctly held that the "amended § 51 providing special benefits in the form of wage projections does not apply to any particular stage in the proceedings." Certainly, it would be anomalous to withhold retroactive application in the interests of finality when a determination of Sliski's entitled benefits may never be final. In any event, the Legislature's statement that this provision was to be deemed procedural in character evidences a clear intention that it be applied retroactively and we are not inclined to parse that intention so fine as to defeat retroactivity in this case.

### B

The board dismissed CNA's argument that Sliski's weekly compensation benefits should be apportioned between CNA and American. CNA urges that it is unfair to require CNA to compensate Sliski according to the level of earnings he would have attained with his carpentry skills, because at the time he accepted his last employment with Doane & Williams, CNA's

insured, Sliski had already been stripped of those skills. Contending that its liability should be limited to the amounts Sliski could have expected as a "partially incapacitated painter's assistant" or an unskilled laborer, CNA urges us to hold American responsible for any additional wages Sliski might have earned as a skilled cabinetmaker, since American was the insurer at risk when Sliski's future in this area of craftsmanship was curtailed as a result of the injury to his left hand. The board acknowledged that "[t]here is some logical appeal in this argument but it is without support in case or statute."

The Massachusetts policy of nonapportionment is long and well established. Known as the "successive insurer rule," this policy dictates that

> "Where incapacity results from the combined effect of several distinct personal injuries, received during the successive periods of coverage of different insurers, the result is not an apportionment of responsibility . . . . Where [this occurs], the subsequent incapacity must be compensated by the one which was the insurer at the time of the most recent injury that bore causal relation to the incapacity."

*Evans's Case*, 299 Mass. 435, 436-437 (1938). Subsequent cases have not deviated from this position and it is now "settled that on a series of injuries contributing to an existing condition of disability the insurer covering the risk at the time of the last injury is responsible for all disability payments." *Carrier* v. *Shelby Mut. Ins. Co.*, 370 Mass. 674, 675 (1976).

There would be no reason to scrutinize CNA's bid for apportionment, were it not for the fact that the circumstances of this case present an ambiguity in our workers' compensation law that has not been clearly addressed before. See *Louis's Case, post* 136 (1997). In his treatise on Massachusetts workers' compensation law, Laurence Locke inquired what the appropriate measure of compensation would be if an employee who has been forced to take less remunerative work as a result of a previous work-related injury for which he is receiv-

ing partial compensation sustains an additional injury.[2] Locke suggests that strict adherence to a successive insurer rule would penalize the employee who has attempted to mitigate his damages by returning to work because, assuming the first insurer is released, the second insurer would only be required to pay the employee two-thirds of the average weekly wage the employee received in his second, lower-paying job. L. Locke, Workmen's Compensation § 343, at 403 (2d ed. 1981). See *Louis's Case, supra* at 139.

We believe such a result does not comport with the intent and purpose of our workers' compensation act and read § 51 to measure lost wage increases by looking to "the total industrial capacity deficit, not simply the previously injured worker's residual capacity." *Louis* v. *Anthony's Pier Four*, 8 Mass. Workers' Comp. Rep. 311, 323 (1994) (Fischel, J., dissenting). Sliski is not to bear the burden of Locke's conundrum. When a young employee has suffered two debilitating injuries, § 51 allows us to refer back to the employee's prospects at the time of his initial injury when it instructs that "[a] determination of an employee's benefits under this section shall not be limited to the circumstances of the employee's particular employer or industry at the time of injury." While it may complicate matters that Sliski was working for two different employers under two different insurers at the time of both injuries, our successive insurer rule does not allow this fact to justify the imposition of harsh economic consequences on an individual who has already suf-

---

[2]It has been suggested that this dilemma arising out of a less remunerative second employment does not exist here because Sliski was only earning $5 an hour at the time he was first injured at Hamilton Studios as opposed to the $6.50 he was earning at Doane & Williams when he sustained his subsequent devastating injury. This does not solve the difficulty in this case, since there is a requirement of projecting lost increases in wages under G. L. c. 152, § 51. At the time of both injuries, Sliski was employed as part of a high school vocational educational program. As a result, these wages are not necessarily accurate reflections of the wages he would have been able to earn had he continued on these career tracks after graduation. This is especially true if we assume Sliski's skills in the field of carpentry were extinguished at the time of his first injury. Were Sliski reduced to the level of an unskilled laborer, it is quite probable that his projected wage increases under § 51 would be much less remunerative in his subsequent work as a painter's assistant than in the field of carpentry he was pursuing in his earlier employment.

fered a serious disabling injury or the administrative burden of requiring an apportionment between two insurers.

The additional burden of such an approach on second insurers asked to compensate injured employees for abilities they did not have during the term of their coverage is mitigated by application of G. L. c. 152, § 37 (1994 ed.), which provides reimbursement to second insurers through a trust fund administered by the State Treasurer to which all workers' compensation insurers contribute and in which all participate. See G. L. c. 152, § 65C (1994 ed.). Realizing that the successive insurer rule creates disincentives for employers to hire disabled workers, a fund was created in 1919 to reimburse workers' compensation insurers a portion of their payments made when an employee who was previously injured suffered a further work-related injury. *Shelby Mut. Ins. Co.* v. *Commonwealth*, 420 Mass. 251, 252 (1995). Today, second insurers can be reimbursed up to 75% of the payments made to employees who have suffered disabilities subsequent to previous physical impairments.[3] G. L. c. 152, § 37. This reimbursement removes the inequity in charging an insurer for the full cost of a disability, some of which was caused before coverage applied and may have been covered by an earlier insurer. Thus there is effected, in a general way, the apportionment between successive insurers for which CNA argues, but without the burden on the worker of collecting from more than one insurer and on the administrative judge of calculating an apportionment in the compensation hearing. While it is true that the language of § 37 is directed toward prior disabilities which aggravate the effects of subsequent injuries,[4] the purpose and intent behind § 37 also apply in those cases where an employee has suffered an injury which,

---

[3]We acknowledge the fact that such reimbursement is not available for the first two-year period immediately following "onset of disability." G. L. c. 152, § 37. During those two years, the second insurer will be solely responsible for paying benefits. This short period is unlikely to impose a significant burden on any one employer before the risk-spreading mechanisms of § 37 become available.

[4]The pertinent language of § 37 reads:

"Whenever an employee who has a known physical impairment which is due to any previous accident, disease or any congenital condition and is, or is likely to be, a hindrance or obstacle to his employment, and who, in the course of and arising out of his employment, receives a personal injury for which compensation is required by this chapter and *which results in a dis-*

as in this case, rather than adding to the prior disability is so devastating as to swamp it. Indeed, when we ask CNA to provide Sliski benefits encompassing economic prospects curtailed prior to its coverage, we impose the same burden imposed on other second insurers traditionally covered by § 37: compensation to the employee for the total effect of his injuries without debating the contribution the latest injury made to that total effect.

We conclude that CNA is responsible for providing Sliski with benefits, including those required by § 51, determined on the basis of Sliski's position and abilities at the time of his first injury and determine that CNA may properly seek reimbursement pursuant to § 37 as appropriate.

C

Both the administrative judge and the board declined to determine how the "expected wage increases" of § 51 and the cost of living adjustment benefits of § 34B should fit together. The board declined to do so on the ground that Sliski would not be entitled to COLA benefits unless and until he established entitlement to permanent and total incapacity benefits under § 34A.[5] The board did say, however, that "COLA benefits are supplemental benefits and serve the same purpose as § 51 benefits, that is protection of the employee's economic position," and thus acknowledged the force of CNA's position that receiving both would constitute "double recovery."

The board's judgment that COLA benefits and compensation benefits under § 51 for expected wage increases serve the

___

*ability that is substantially greater by reason of the combined effects of such impairment and subsequent personal injury than that disability which would have resulted from the subsequent personal injury alone, the insurer or self-insurer shall pay all compensation provided by this chapter. . . . Insurers making payments under this section shall be reimbursed by the state treasurer from the trust fund created by section sixty-five in an amount not to exceed seventy-five percent of all compensation due . . ."* (emphasis added).

[5]While this fact may have influenced the board, it is a conservative assumption that Sliski's paraplegia will entitle him to permanent disability benefits, and, as the § 34 benefits Sliski was originally granted are only available for 260 weeks, this question is quickly becoming timely. G. L. c. 152, § 34, as appearing in St. 1985, c. 572, § 42. But see St. 1991, c. 398, §§ 59, 106.

same purpose is neither obvious nor necessarily correct. While COLA benefits are aimed at protecting an individual's economic position by acting as a buffer against the erosion of inflation, § 51 benefits attempt to compensate young workers for the economic opportunities they would have had if their careers had not been interrupted so early. In some cases, an employee's abilities and prospects at the time of injury may be such that the employee could not reasonably look forward to wage increases related to skill acquisition, so that any wage increases would be purely inflationary. In other cases, however, economic projections under § 51 will reflect expectations regarding skill development and job progression. Because the purposes of § 34B and § 51 are not identical, they cannot be labeled mutually exclusive and decisions regarding their proper interplay must be made on a case-by-case basis.

### D

CNA takes the position that the board's decision is invalid because G. L. c. 152, § 1 (8) (1994 ed.), defines a "[r]eviewing board" as a three-member panel. Although this case was heard by such a three-member panel, the decision was only rendered by two members due to the intervening retirement of the third. This case does not bear the infirmity which spoiled *Berninger's Case*, 253 Mass. 52 (1925), a case in which the board's holding was only signed by one member, as one member dissented and the other was deceased. In finding that no decision had been filed in that instance, we noted that "a decision could not be reached without the concurrence of at least two members." *Id.* at 53. We have stated before that a board's findings "on review apparently are sufficient if signed by a majority of a properly constituted board." *Wozniak's Case*, 299 Mass. 471, 474 (1938). The lack of the retiring board member's signature on the board's decision is not enough to render the decision invalid.

The case is remanded for further proceedings consistent with this opinion.

*So ordered.*